**In re the MARRIAGE OF Charitie S. HOWARD and Dennis M. Howard, Jr.**

**Upon the Petition of Charitie S. Howard, Appellant,**

**and**

**Concerning Dennis M. Howard, Jr., Respondent,**

**Dennis Howard, Sr., and Connie Howard, Intervenors–Appellees.**

No. 02–0211.

Supreme Court of Iowa.

May 7, 2003.

Anjela A. Shutts of Whitfield & Eddy, P.L.C., Des Moines, for appellant.

Eric R. Eshelman, Des Moines, for appellees.

CADY, Justice.

In *Santi v. Santi,* 633 N.W.2d 312 (Iowa 2001), we determined that at least one subsection of the Iowa grandparent visitation statute was unconstitutional on its face. In this appeal, we revisit the question of the statute's constitutionality to determine whether the section of the statute permitting a petition for grandparent visitation when the parents of a child are divorced is also unconstitutional. We conclude that it is unconstitutional on its face, and we reverse the decision of the district court and dismiss this petition for grandparent visitation.

## I. Background Facts and Proceedings.

Delainey Howard (Delainey) was born on April 28, 1999. Her parents, Charitie Howard (Charitie) and Dennis Howard, Jr., (Dennis) were in the process of dissolving their marriage. The pending dissolution prompted Dennis' parents, Connie and Dennis Howard, Sr., (Howards) to file a petition for grandparent visitation to establish their right to visitation with Delainey. *See* Iowa Code § 598.35(1) (permitting a petition for grandparent visitation when "[t]he parents of the child are divorced."). A final decree was issued in the dissolution action on February 16, 2000. One of the issues decided by the decree was the visitation arrangement under which Dennis and the Howards were to have subsequent contact with Delainey. The district court granted Dennis joint legal custody and unsupervised visitation, but made the exercise of his visitation right contingent on his resumption of drug treatment and counseling. The court did not grant the Howards independent visitation, choosing instead to allow them visitation through their son.

Unfortunately, Dennis failed to pursue drug treatment and counseling as ordered. In March 2000, Charitie filed an application to alter his visitation privileges. In response, the Howards filed a motion for intervention, requesting again that they be granted visitation independent of their son. The district court ordered Charitie and Dennis to participate in mediation to settle on an agreeable revised visitation schedule.[1] When Dennis failed to show for the mediation, the court put in place its own supervised visitation schedule that again did not provide for independent visitation for the Howards. The visitation alteration made no real difference to Dennis—his

---

1. At this point in the proceedings, Charitie had already appealed from the court's original decree order. Therefore, the court concluded it no longer had jurisdiction to rule on the Howards' request for enhanced visitation because they sought to intervene in a matter that was the subject of a pending appeal. Charitie eventually dismissed her appeal, at which time the Howards filed an application for modification of the decree of dissolution as it related to grandparent visitation.

contact with Delainey was waning—but it made all the difference to the Howards, who wished to have regular contact with their granddaughter and considered the current visitation arrangement an impediment to that goal.

In May 2000, with the possibility of further legal proceedings looming, Charitie and the Howards attempted to cooperate under an informal visitation arrangement. Charitie contacted the Howards to set-up the first visit, which later occurred at a local restaurant. A second visit followed in June. From all outward appearances, both visits went well. During the second meeting, the Howards asked Charitie to allow them to visit Delainey without Charitie present. Charitie responded by stating that she wanted her daughter to have a more established relationship with the Howards before taking that step. A third visit soon occurred at a local park, and a fourth followed at the zoo.

During the fourth visit, the Howards requested that Delainey be present at festivities celebrating their twenty-fifth wedding anniversary and asked Charitie to come with Delainey if it would make her feel more comfortable about the visit. Charitie denied the Howards' request and, in the course of the conversation, stated that she did not foresee a time when she would permit the Howards to have an unsupervised, overnight visit with Delainey. This conversation apparently did irreparable damage to the temporary peace that had been forged between the parties. Soon afterward, the Howards filed an application for modification of the decree of dissolution of Charitie and Dennis' marriage as it related to grandparent visitation in the district court, seeking once again to establish visitation rights independent of those of their son. Before Charitie was served with the application, one final visit occurred, again at a public park. Charitie

was subsequently served with the application and the informal visitation arrangement came to an abrupt end.

At trial, the already tenuous relationship between Charitie and the Howards deteriorated into accusations and finger pointing. The Howards claimed that Charitie had only begrudgingly allowed their visits with Delainey in the first place, and when the visits did occur, they were under the oppressive supervision of Charitie and her mother (Delainey's maternal grandmother), who had also been present at each meeting. Moreover, they claimed that Charitie maintained a double standard that permitted ample contact with Delainey for her maternal relatives, but insignificant contact for her paternal relatives. Dennis also played a limited role at the trial, testifying in support of the Howards' application and stating that he favored guaranteed visitation with Delainey for his parents.

Charitie responded to the Howards' assertions by claiming that she had always wanted to cultivate a relationship between her daughter and her paternal grandparents, but had wanted to do so at a pace suitable to Delainey's development. She defended her hesitancy in allowing extended, unsupervised visits by claiming the Howards' lifestyle and various incidents in their past had made her conclude that unsupervised visits were inappropriate. Charitie also expressed concern over the fact that Dennis continued to visit or even live with his parents for periods of time, a situation that she believed could lead to him having contact with Delainey outside of the context of the supervised visitation ordered by the district court.

On September 4, 2001, the district court issued its ruling regarding the application for grandparent visitation, finding that "there was no evidence presented or demonstrated to the Court that visitation . . .

would be harmful to the minor child." Although the court recognized "that Charitie has a right as a parent to make decisions regarding her daughter," it ordered two, four-hour visits monthly between the Howards and Delainey, unsupervised after the first two visits, but without overnight visitation. On September 6, we issued our opinion in *Santi*, invalidating as unconstitutional one portion of the Iowa grandparent visitation statute. In response to *Santi*, Charitie filed a motion to expand and enlarge the district court's initial ruling under Iowa Rule of Civil Procedure 1.904(2) (formerly rule 179(b)). On January 17, 2002, the district court denied the motion concluding that *Santi* was inapplicable to the case. Charitie appeals from that ruling.[2]

## II. Standards of Review.

Although this appeal presents unique factual and legal issues, it also returns us to an area of the law we considered at length in *Santi* less than two years ago. *Santi* provided us the opportunity to reexamine Iowa's grandparent visitation statute[3] in light of the United States Supreme Court's decision in *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), which introduced a myriad of new constitutional considerations to the discussion of parental decision-making. Although we acknowledged in *Santi* that we were not bound by federal court analysis of federal constitutional provisions when construing the Iowa Constitution, we also noted that such interpretations could prove helpful.[4] *Santi*, 633 N.W.2d at 317. For that reason, we undertook a studied consideration of the guidance provided by the Court in *Troxel* and by other state courts of last resort. That consideration led us to state a number of legal principles applicable to a discussion of a parent's decisional rights in Iowa, especially as they relate to the grandparent visitation statute.

One of our first conclusions was that challenges to Iowa's grandparent visitation statute raise "questions of substantive due process and liberty interests in the context of statutory interpretation" obliging us "to review the record de novo, making our own evaluation of the totality of the circumstances." *Santi*, 633 N.W.2d at 316. Of course, the nature of the interests at hand required a further consideration of the appropriate level of constitutional scrutiny with which to examine the statute. We acknowledged that *Troxel* did not follow the strict scrutiny standard of review traditionally used when a statute burdens a fundamental liberty. *Santi*, 633 N.W.2d at 317. Instead, the Court in *Troxel*

---

**2.** The Howards' brief included a discussion of additional facts and proceedings that went beyond the scope of the issues finalized for appeal as a result of the district court's denial of Charitie's motion to expand and enlarge its ruling. These additional matters were not considered in deciding this case. *See* Iowa Rs.App. P. 6.1, .10, .14.

**3.** Although we refer to Iowa Code section 598.35 (2001) as the "Iowa grandparent visitation statute" to simplify our references to the code section, it should be noted that the statute also allows for visitation petitions to be filed by great-grandparents. Iowa Code § 598.35. Our conclusions on the constitutionality of the statute apply with equal force

no matter which generation petitions for visitation.

**4.** In this appeal, as in *Santi v. Santi*, the appellant has failed to clearly articulate whether her challenge to the constitutionality of the Iowa grandparent visitation statute arises under the federal or state constitution. *Santi v. Santi*, 633 N.W.2d 312, 316–17 (Iowa 2001). However, based on the arguments presented by Charitie and defended by the Howards in their briefs and at oral argument, it is apparent that Charitie's challenge is based on the provisions of the Iowa Constitution, the interpretation of which is our exclusive prerogative. *Callender v. Skiles*, 591 N.W.2d 182, 187 (Iowa 1999).

seemed to suggest a more flexible, neutral standard premised largely on the changing shape of the traditional family structure and the strength of the potential competing privacy interests of children and other family members. *Troxel*, 530 U.S. at 63–64, 87–88, 120 S.Ct. at 2059, 2071–72, 147 L.Ed.2d at 55–56, 69–70 (Stevens, J., dissenting). Several other courts, as well as a number of legal scholars, have noted this subtle alteration and sought to crystallize its meaning and application. *See* David D. Meyer, *Constitutional Pragmatism for a Changing American Family*, 32 Rutgers L.J. 711, 713–22 (2001).

Nevertheless, *Troxel* did not reject the historical notion that the parental caretaking interest is fundamental, but confirmed it as " 'perhaps the oldest of the fundamental liberty interests recognized by [the] Court.' " *Santi*, 633 N.W.2d at 317 (quoting *Troxel*, 530 U.S. at 65, 120 S.Ct. at 2060, 147 L.Ed.2d at 56). Thus, in *Santi*, we confirmed the protected status of parental caretaking, and specifically held that it must be guarded by the "highest level of scrutiny" when that liberty interest emanates from a decision by fit, married parents. *Id.* at 318. This approach means that any infringement by the state must be " 'narrowly tailored to serve a compelling state interest.' " *Id.* (quoting *State v. Klawonn*, 609 N.W.2d 515, 519 (Iowa 2000)).

This appeal, of course, involves an examination of a different subsection of the visitation statute in the context of a different set of facts. The Howards have seized on these distinctions, arguing that section 598.35(1) is distinguishable from section 598.35(7) in constitutionally significant ways. In particular, the Howards note that here, unlike *Santi*, we are dealing with a divorced family with two parental decision-makers who have different opinions on the scope of their daughter's visitation with her grandparents. This factual distinction, they believe, warrants the application of a lesser degree of scrutiny in our analysis of this subsection of the statute. The Howards also argue we specifically limited the strict scrutiny standard of review in *Santi* to decisions by fit, married parents. Thus, we must decide if the doctrinal approach adopted in *Santi* should be followed when the traditional family structure has been altered by divorce.

■ In deciding this question, we emphasize that divorce or pending divorce do not alone diminish the fundamental interest of parents who make caretaking decisions. Divorce opens the door for courts to resolve disputes between parents, but it does not make parents unfit to make decisions in the best interest of their children. To conclude that a divorce alone permits the state to make choices for an objecting parent (or parents) likely violates the core *Troxel* precept granting a presumption in favor of a fit parent's decisions regarding their children. *See Troxel*, 530 U.S. at 69–70, 120 S.Ct. at 2062, 147 L.Ed.2d at 58–59 (while the Court recognized the changing nature of the traditional family has injected other persons outside the nuclear family into the role of caretaker, it did not limit the presumption to the traditional family unit); *see also* Joan Catherine Bohl, *Grandparent Visitation Law Grows Up: The Trend Toward Awarding Visitation Only When the Child Would Otherwise Suffer Harm*, 48 Drake L.Rev. 279, 308 (2000) (discussing the judicial trend toward redefining an " 'intact family' ... in terms of function and purpose" rather than as "a nuclear unit consisting of the child's married, natural parents"). We think the heightened protection of this valued fundamental interest recognized in *Santi* should not be altered by the marital status of otherwise fit parents, and the state should have no lesser standard for intervention. Thus, we apply the strict scrutiny analysis

to our examination of section 598.35(1). The particular circumstances of the divorce that tend to disrupt the decision-making of parents can be considered as they implicate the compelling interests of the state to intervene. We conclude this traditional constitutional analysis captures our sense of the essential balance between the caretaking interests of parents and the state under our constitution, and we reject any reviewing standard under section 598.35(1) short of strict scrutiny.

### III. Compelling State Interest.

■ Section 598.35(1) allows the court to order grandparent visitation if: (1) the parents are divorced, (2) "visitation is in the best interests of the child," and (3) "the grandparent . . . [has] established a substantial relationship with the child prior to the filing of the petition." Iowa Code § 598.35(1). Because the statute interferes with a fundamental interest, a compelling interest of the state must be demonstrated for the statute to withstand constitutional scrutiny. Thus, we turn first to a consideration of the state's compelling interest.

We addressed the compelling state interest requirement in the context of our grandparent visitation statute in *Santi* under that subsection of the statute permitting grandparent visitation when visitation had been unreasonably denied. *See id.* § 598.35(7). In the context of that particular subsection, we held that the desire of the state to foster close relationships between grandparents and grandchildren fell short of the compelling state interest necessary to justify court-ordered visitation over the objection of fit, married parents. *Santi*, 633 N.W.2d at 321. However, we declined to decide whether a threshold showing of harm was necessary to establish a compelling interest. *Id.* Instead, we found the statute was constitutionally

flawed because it did not give fit parents the presumption that their decision-making "will benefit their children, not harm them." *Id.* Without this presumption, the visitation statute effectively permitted courts to second-guess parental decisions. *Id.* Thus, the statute was not narrowly tailored to serve any compelling state interest. *Id.*

We intimated in *Santi* that divorce was a circumstance that can cause a breakdown of the decision-making of parents. *Id.* However, this was not to suggest that divorce alone establishes a compelling interest of the state to warrant intrusion into a parent's decision to deny or limit visitation. We only indicated that divorce, more than the reasonableness of a particular decision to deny visitation, generates the type of concerns that can justify state interference.

We recognize that all fifty states have adopted some type of grandparent visitation statute, and in addressing the constitutionality of these statutes courts differ on the appropriate level of harm necessary to justify state intervention. *See* Laurence C. Nolan, *Beyond* Troxel: *The Pragmatic Challenges of Grandparent Visitation Continue*, 50 Drake L.Rev. 267, 267–68 n. 2 (2002). These differences have arisen as courts struggled with the implications of this country's long-standing doctrine of parental autonomy, which permits parents to raise their children without state interference except for the most cogent reasons. *See id.* at 278–80. Yet, some form of harm to a child has traditionally been necessary under the Due Process Clause to support interference by the state in this sensitive area. *See Wisconsin v. Yoder*, 406 U.S. 205, 233–34, 92 S.Ct. 1526, 1542, 32 L.Ed.2d 15, 35–36 (1972) (Amish children exempt from compulsory education law because they will not be harmed by receiving an Amish education); *Pierce v. Soc'y of*

*Sisters,* 268 U.S. 510, 534, 45 S.Ct. 571, 573, 69 L.Ed. 1070, 1077–78 (1925) (state cannot interfere with decision by parents to send children to private schools when decision is not inherently harmful). Harm not only has been the prevailing standard of intervention, but it is most suitable in analyzing a grandparent visitation statute. It is consistent with the essential presumption of fitness accorded a parent and is stringent enough to prevent states from meddling into a parental decision by simply making what it believes is a better decision. Nolan, 50 Drake L.Rev. at 280. It also recognizes the challenges inherent in ordering grandparent visitation, including the tremendous burdens and strain placed on the parent-child relationship. *See id.* at 280–88; *McMain v. Iowa Dist. Ct.,* 559 N.W.2d 12, 14–15 (Iowa 1997) (recognizing grandparent visitation litigation can have a destabilizing impact on children).

 Divorce, of course, can alter the decision-making ability of parents to a point that may generate a sufficient state interest to intervene in areas not affecting fundamental rights, or to invoke the need for special considerations to protect children. *See In re Marriage of Vrban,* 293 N.W.2d 198, 202 (Iowa 1980) (holding statute allowing court to order noncustodial parent to pay child support for adult child attending school was not unconstitutional even though married parents were not required to provide such support). Divorce, by necessity, permits the state to intervene to resolve immediate and direct disputes that arise between parents over custody and visitation. Nevertheless, divorce is not the sine qua non of a *compelling* state interest when non-parents seek to challenge parental decision-making. Instead, a *compelling* state interest arises when substantial harm or potential harm is visited upon children. *See Roth v. Weston,* 259

Conn. 202, 789 A.2d 431, 445 (2002); *Von Eiff v. Azicri,* 720 So.2d 510, 514–16 (Fla. 1998); *Brooks v. Parkerson,* 265 Ga. 189, 454 S.E.2d 769, 772–74 (1995); *Blixt v. Blixt,* 437 Mass. 649, 774 N.E.2d 1052, 1061 (2002); *Hawk v. Hawk,* 855 S.W.2d 573, 579–81 (Tenn.1993); *Williams v. Williams,* 256 Va. 19, 501 S.E.2d 417, 418 (1998); *In re Custody of Smith,* 137 Wash.2d 1, 969 P.2d 21, 28–29 (1998); Kathleen S. Bean, *Grandparent Visitation: Can the Parent Refuse?,* 24 J. Fam. L. 393, 408 (1985–86) (arguing the harm standard satisfies the constitutional standard of a compelling state interest). Thus, the presence of harm must be at the center of a grandparent visitation statute, not the mere marital status of parents. *See Roth,* 789 A.2d at 449 (third-party visitation statute that required no more than disruption of family unit subject to unconstitutional application in the absence of judicially mandated considerations); Nolan, 50 Drake L.Rev. at 290 (statutes that provide for automatic standing to grandparents based on divorce are problematic). The problem with a divorce standard is that it either assumes harm occurs in all families touched by divorce when there is no grandparent visitation or it embraces a standard short of harm. We reject both approaches.

 There is no doubt, in a broad sense, that grandparent-grandchild relationships are beneficial and should be promoted. *See In re Herbst,* 971 P.2d 395, 399 (Okla.1998); Elaine D. Ingulli, *Grandparent Visitation Rights: Social Policies and Legal Rights,* 87 W.V. L.Rev. 295, 297 (1984–85). Children deprived of the influence of a grandparent may lose important opportunities for positive growth and development. However, such a generalization falls short of establishing the type of harm that would justify state intervention into a parental decision denying contact.

*In re Herbst,* 971 P.2d at 399; *see also Santi,* 633 N.W.2d at 321 (fostering close relations between grandparents and grandchildren is not a compelling state interest). If grandparent visitation is to be compelled by the state, there must be a showing of harm to the child beyond that derived from the loss of the helpful, beneficial influence of grandparents. *See Brooks,* 454 S.E.2d at 773 (although grandparent visitation may promote the health and welfare of a child, it may only be imposed on objecting parents upon a showing that the failure to order visitation "would be harmful to the child").

■ We turn to the three requirements under our grandparent visitation statute to examine if they reveal a sufficient element of harm to support a compelling state interest. We have previously indicated that the element of divorce is, alone, insufficient to establish a compelling state interest for the state to intervene into the issue of grandparent visitation. Similarly, the best interests of a child requirement under the statute is insufficient. *See Santi,* 633 N.W.2d at 321. Thus, we look to the final requirement of an established, substantial relationship between grandparent and grandchild to determine if this requirement supports a compelling state interest.

On its face, the requirement of an established substantial relationship fails to specify any harm or potential harm to the child. Yet, when a grandparent has established a substantial relationship with a grandchild, as required under our statute, an emotional bond can be created that, if severed, can inflict harm on the child. *Roth,* 789 A.2d at 445–46. Such harm can be substantial when the grandparent has developed a substantial relationship over a period of time, something akin to a parental relationship. *Id.* at 445. Thus, these two factors—the cessation of a substantial existing grandparent-grandchild relation-

ship and sufficient harm—are in effect "two sides of the same coin." *Id.* This connection reveals our legislature, in creating section 598.35, was likely concerned with protecting children from substantial emotional harm by specifically restricting the statute to cases involving a substantial existing relationship. This is the type of standard other jurisdictions have imposed in considering grandparent visitation. *See Blixt,* 774 N.E.2d at 1061 n. 16 (listing cases from other jurisdictions using comparable standards).

■ Ordinarily, our preference is to interpret our statutes in a manner to render them constitutional. *See Iowa Dep't of Transp. v. Iowa Dist. Ct.,* 592 N.W.2d 41, 43 (Iowa 1999). However, even if we assume that such harm is a component of the statute and would be sufficient to satisfy the Due Process Clause, the element of specific harm is not the only constitutional requirement we must consider. We must also consider whether the grandparent visitation statute is narrowly tailored to serve the state's interest of protecting children from substantial emotional harm.

## IV. Narrowly Tailored Statute.

■ Even if our statute is interpreted to identify a compelling interest of the state, the three requirements utilized by the statute to permit grandparent visitation to take place over the objection of a parent fail to impose the essential limitations demanded by *Troxel* to narrowly serve the compelling interest to intervene and to safeguard against unwarranted intrusions into the decisions of fit parents. Thus, for the same reasons identified in *Santi,* the statute fails to comport with the Due Process Clause on its face.

■ The most critical deficiency in the statute is, as we observed in *Santi,* its failure to require a finding of parental unfitness. *Troxel* made it clear that when

a forum has been created for a court to consider grandparent visitation, the judge must presume a fit parent acts in the best interests of their children, and "so long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the state to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Troxel,* 530 U.S. at 68–69, 120 S.Ct. at 2061, 147 L.Ed.2d at 58. This presumption is not simply applicable to joint decisions of fit married parents, but applies to the decisions of all fit parents.[5] *See Stanley v. Illinois,* 405 U.S. 645, 651–53, 92 S.Ct. 1208, 1212–13, 31 L.Ed.2d 551, 558–59 (1972) (state may not presume parental unfitness and interfere with unwed father's custody rights absent proof of unfitness). It is parental fitness that gives rise to the presumption, not mere marital status. Divorce does not diminish the parent's fundamental interest in parenting and does not make them less capable parents. Thus, the divorce requirement under section 598.35(1) does not eliminate the need for the parents to be granted the presumption of fitness. *See Roth,* 789 A.2d at 449 (statute permitting visitation after a disruption of the family unit provides inadequate protection for the parental interest). The failure of the statute to give the presumption of fitness to parents renders it unconstitutional on its face. *Santi,* 633 N.W.2d at 321.

Moreover, the other two requirements of section 598.35(1) do not require or even contemplate that the presumption be utilized. The best interest standard is a doctrine that embraces the interests of children, and we have never interpreted it to protect the fundamental parenting interest or to provide a presumption for fit parents. Similarly, the grandparent-grandchild relationship requirement does not address the presumption that fit parents make decisions that benefit their children. There is nothing in either requirement that mandates the judge to give special weight to the parents' decision. *See Troxel,* 530 U.S. at 70, 120 S.Ct. at 2062, 147 L.Ed.2d at 59.

Accordingly, the statute on its face not only fails to recognize the degree of harm or potential harm to the child needed to support state intervention, but it fails "to require a threshold finding of parental unfitness." *Santi,* 633 N.W.2d at 321. It also fails to require the court to consider a parent's objections to allowing visitation. We believe these provisions must be a part of any grandparent visitation statute under our Due Process Clause.

## V. Conclusion.

We conclude section 598.35(1) is unconstitutional on its face. We therefore reverse the district court order granting grandparent visitation.

The requests for appellate attorney fees are denied.

**REVERSED AND DISMISSED.**

---

5. The mere fact that there is a divorce does not deprive the parent of the presumption, but merely means that the presumption operates separately depending upon whose care and control is at issue. The issue of grandparent visitation addresses whether someone other than the parents are going to have care and control over their children. Thus, when the two parents disagree over grandparent visitation, the court considers the presumption of fitness as it relates to the parent who is being asked to give up his or her care and custody to provide the grandparent visitation. *See* Natania M. Soto, Note, *Family Law: Whose Kids are They, Anyway?: Analyzing* Troxel v. Granville *and the Current State of Oklahoma's Grandparent Visitation Statute,* 54 Okla. L.Rev. 413, 438–40 (2001).