Arnis and Lucille LAMBERTS,
Appellants,

v.

John LILLIG, Appellee.

No. 02–0435.

Supreme Court of Iowa.

Oct. 8, 2003.

Stacey N. Warren of Babich, Goldman, Cashatt & Renzo, P.C., Des Moines, and Robert H. Laden of Laden & Pearson, P.C., Des Moines, for appellants.

Thomas J. McCann of Law Office of Thomas J. McCann, Des Moines, for appellee.

CADY, Justice.

In this appeal, we consider the constitutionality of another subsection of Iowa's grandparent visitation statute. As in *Santi v. Santi*, 633 N.W.2d 312 (2001) and *In re Marriage of Howard*, 661 N.W.2d 183 (2003), we conclude that the subsection of the statute at issue in this case is unconstitutional. We also consider and reject the appellants' argument that the district court erred in determining an alleged contractual agreement signed by the parties at the end of a mediation session was unenforceable. We affirm the ruling of the district court.

## I. Background Facts and Proceedings.

Like *Santi* and *Howard*, this case involves a family wrenched apart by conflict over visits between grandparents and grandchildren. Arnis and Lucille Lamberts (Arnie and Lucy) are the maternal grandparents of two children, Robert and Alexis. Robert and Alexis' father, John Lillig (John), was married to Arnie and Lucy's daughter, Leslie. Tragically, Leslie died in April 1999 from complications arising from Alexis' birth.

Prior to Leslie's passing, Arnie and Lucy and the Lillig family maintained a strong familial bond, which included regular contact with one another. Arnie and Lucy took an active role in their grandson's life and no doubt looked forward to a similar role with their future granddaughter. After Leslie's death, the family members grew closer in many ways. Arnie

offered John a job with his company, which allowed John to spend additional time with his children while also earning a living. Lucy took on the role of surrogate mother to Alexis, although Robert remained in day care to avoid disrupting his life any further. John and the children ate dinner with Arnie and Lucy every evening.

As the months passed, however, John began to regain his footing and the extended family spent less and less time together. A few months after Leslie's death, John chose to take Alexis out of Lucy's care and placed her at the day care that Robert attended. John explained that he did this to provide the children some continuity and togetherness and to assure that he had time alone with them during evenings. The family's nightly dinners also ended and visits became less frequent. Arnie and Lucy's consternation over the situation grew.

In November 1999, John met a woman, Amie, and the two began dating. As John and Amie's relationship advanced, the Lillig children's contact with their maternal grandparents declined further. The worsening visitation situation began to carry over into nearly every part of the family's interaction. At one point, Robert told Amie, "granny doesn't like you." Comments of this nature led to a confrontation between John and Arnie and Lucy and resulted in John quitting the job Arnie had given him after Leslie died. John also asked that Arnie and Lucy come to his home to visit the children rather than him bringing the children to them. Soon, the family's relationship had deteriorated to the point that they communicated only through emails.

In July 2000, Arnie and Lucy, apparently concerned about the effect John and Amie's relationship was having on their

interaction with Robert and Alexis, filed a petition for grandparent visitation pursuant to Iowa Code section 598.35(3) (2001), which permits a district court to order visitation in the event "[t]he parent of the child, who is the child of the grandparent, ... has died." In September 2000, Arnie and Lucy were granted temporary visitation with their grandchildren pending a final ruling on visitation. Not long afterward, John and Amie married.

With a January 2001 trial date looming, all four adults—Arnie, Lucy, John, and Amie—met with a family counselor in hopes of reaching a solution to the conflict. Not surprisingly, the counselor's interactions with the family revealed strong emotions and hard feelings. Focusing on Robert and Alexis' interests, the counselor opined that each needed a "solid relationship" with Arnie and Lucy and that the children were "at risk" if outside intervention of some sort did not guarantee that relationship. Ultimately, the parties were unable to reach an agreement on visitation, and the dispute proceeded to trial.

At trial, the district court heard two days of testimony before deciding to continue the case. Rather than providing a final disposition in the case, the court suggested the parties should undertake additional formal mediation to resolve the situation. The court also set aside the temporary visitation order that previously had been established in Arnie and Lucy's favor and warned that it would not rule on the visitation issue until this court issued its decision in *Santi*, which was then pending. While the parties planned for the mediation, Amie filed a petition for stepparent adoption, which was eventually granted in December 2001.

The court-ordered mediation proceeded similarly to the informal mediation previously conducted. However, in early March 2001, the parties apparently reached a breakthrough and signed a document providing limited visitation for Arnie and Lucy. The parties operated under these terms for a few months before John allegedly refused to provide further visitation sometime in the summer of 2001.

In January 2002, the parties returned to the district court for a final hearing and resolution to their dispute. After the hearing, the court took the case under advisement, with the benefit of our September 2001 ruling in *Santi*. On February 11, the court issued its ruling denying grandparent visitation based on its conclusion that Iowa Code section 598.35(3) was unconstitutional in light of our decision in *Santi*. The district court also determined that the document signed by the parties during the court-ordered mediation in March 2001 was unenforceable because there had been "no meeting of the minds as to the full parameters of the agreement." Finally, the court offered its opinion as to what it believed was the best visitation arrangement possible if the statute was not unconstitutional.

The Lamberts appeal from the district court's ruling, asking that we find the statute constitutional and implement the district court's suggested visitation arrangement. However, for the reasons that follow, we affirm the district court's ruling.

## II. Standards of Review.

 As we observed in *Howard*, "challenges to Iowa's grandparent visitation statute raise 'questions of substantive due process and liberty interests in the context of statutory interpretation' obliging us 'to review the record de novo, making our own evaluation of the totality of the circumstances.'" 661 N.W.2d at 187 (quoting *Santi*, 633 N.W.2d at 316). We normally review questions of contractual construction and interpretation as a matter of law.

*Hartig Drug Co. v. Hartig,* 602 N.W.2d 794, 797 (Iowa 1999). However, to the extent our review focuses on the question of whether a party has contractually waived a constitutional right, our review is de novo. *See Callender v. Skiles,* 591 N.W.2d 182, 185 (Iowa 1999).

### III. Constitutionality of Iowa Code Section 598.35(3).

■ This case presents our third opportunity to consider the constitutionality of Iowa's grandparent visitation statute. However, only the facts of this case distinguish it from our considerations of the statute in *Santi* and *Howard.* Importantly, no alterations have been made to the statute itself—it remains in the same form as it was in both of our prior cases. Perhaps not surprisingly, we conclude that the same fundamental flaws found fatal to subsections (1) and (7) of the statute also doom subsection (3).

■ The overarching principle in our analyses of the grandparent visitation statute is that a parent's "interest in the care, custody, and control of [his] children" is " 'perhaps the oldest of the fundamental liberty interests recognized by' " the United States Supreme Court. *Santi,* 633 N.W.2d at 317 (quoting *Troxel v. Granville,* 530 U.S. 57, 65, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49, 56 (2000)). We were guided by this principle in resolving *Santi* and we reconfirmed it in *Howard,* where we clarified that the parental interest is not lessened "by the marital status of [an] otherwise fit [parent]." *Howard,* 661 N.W.2d at 188. This means the state has

"no lesser standard for intervention" in a case such as this one, in which one spouse has outlived the other spouse.[1] *Id.* For this reason, we apply strict scrutiny constitutional analysis to Iowa Code section 598.35(3) just as we applied it in our examinations of subsections (1) and (7). *See id.* at 188–89; *Santi,* 633 N.W.2d at 318. This analysis requires "that any infringement by the state . . . be ' "narrowly tailored to serve a compelling state interest." ' " *Howard,* 661 N.W.2d at 188 (citations omitted).

The grandparent visitation statute has three elemental requirements that must be satisfied before visitation is granted: (1) the petition for visitation must be based on one of seven situations related to the family structure, (2) the decision to award visitation must be in the best interests of the child(ren), and (3) a substantial relationship must exist between the grandparent(s) and grandchild(ren) before the filing of the petition. *See* Iowa Code § 598.35(3). In *Howard,* we examined each of these three requirements to determine whether any of them supported a compelling state interest. 661 N.W.2d at 191. We determined that both the situational and best interests elements failed to provide the necessary compelling state interest. *See id.* Yet, we also noted that the last element—a substantial relationship—revealed some legislative concern "with protecting children from substantial emotional harm," a "type of standard other jurisdictions have imposed in considering grandparent visitation." *Id.*

---

1. One significant factual difference between this case and our prior cases is the presence and role of Amie, who, by the time of the district court's ruling, was Robert and Alexis' mother by adoption. Neither party suggested Amie significantly affected the application of the legal principles surrounding the grandparent visitation statute, and we are not in-

clined to further consider the effect, if any, of her adopting Robert and Alexis. Instead, we concentrate on John's role as a parent given that it is primarily his parental caretaking interest targeted by Arnie and Lucy's petition for grandparent visitation. *See In re Marriage of Howard,* 661 N.W.2d 183, 192 n. 5 (Iowa 2003).

It is unnecessary to analyze this case under the compelling state interest prong of the strict scrutiny test because the visitation statute clearly is not narrowly drawn. Nevertheless, a compelling state interest analysis in this case would very likely reach the same conclusions reached in *Howard*, even though this petition for grandparent visitation arises under a different subsection of the statute. As previously noted, the parental interest is not lessened "by the marital status of [an] otherwise fit [parent]." *Id.* at 188. There have been no allegations that John is unfit, and there is no indication in the record that such an allegation, if made, could be established. This core fact alone undermines any potential finding of a compelling state interest in this case.

In *Howard*, we ultimately concluded that Iowa Code section 598.35(1) was unconstitutional because

> the three requirements utilized by the statute to permit grandparent visitation to take place over the objection of a parent fail to impose the essential limitations demanded by *Troxel* to narrowly serve the compelling interest to intervene and to safeguard against unwarranted intrusions into the decisions of fit parents.

*Id.* at 191. We determined that that statute was deficient in three particulars: "on its face [it] not only fails to recognize the degree of harm or potential harm to the child needed to support state intervention, but it fails 'to require a threshold finding of parental unfitness'" and "fails to require the court to consider a parent's objections to allowing visitation." *Id.* at 192 (citation omitted). "Thus, for the same reasons identified in *Santi*, the statute fail[ed] to comport with the Due Process Clause on its face" because "these provisions must be a part of any grandparent visitation statute under our Due Process

Clause." *Id.* at 191–92. Iowa Code section 598.35(3) is similarly deficient. For this reason, it too "fails to comport with the Due Process Clause on its face," making it unconstitutional. *Id.* at 191. The district court correctly determined that the statute was unconstitutional and rightly denied Arnie and Lucy's visitation petition.

## IV. Enforceability of the Mediation Document.

■ At the end of the parties' court-ordered mediation in March 2001, Arnie, Lucy, John, and Amie each signed a one-page, hand-written document drafted by the mediator, Bruce Buchanan, which stated the following:

> We the undersigned agree to the following:
> 1. At least 1 full weekend overnights every 6 weeks.
> 2. Other visitation at the discretion of all parties.
> 3. Bruce Buchanan is the binding arbitor [sic] on all matters not revocable regard[ing] Alexis + Robert.

Arnie and Lucy argue that this document is an enforceable contract by which John guaranteed them limited visitation with Robert and Alexis. They point to several factors that they believe support this argument, including that mediation was undertaken at the direction of the district court, both parties later brought the document to their respective attorneys for additional action, and John agreed to the terms of the document and followed the terms for a period of time.

John responds to this argument with a two-pronged attack. First, he argues that the document is unenforceable because it does not reflect a "meeting of the minds" among the parties. He claims that he signed the document believing it was an "exercise" in compromise that had no legal bearing. Furthermore, he asserts that,

even if the document is a contract, he was insufficiently apprised of its meaning to have validly waived his constitutional rights as a parent. To support this argument, he again refers to his and—he believes—others' understanding that the document was generated solely as a method of helping the parties reach a compromise on visitation.

The district court concluded that there was no meeting of the minds between the parties in relation to the document given its "therapeutic" use and the parties' understanding that it was, at least, in a state of flux as far as being a final compromise over visitation. Yet, even assuming the mediation document constitutes a contract—a point which the district court did not accept and which we view with ample skepticism—we believe it is clear that John acted with insufficient understanding to have truly waived his constitutional rights by its signing. Thus, whatever the document's nature, it is unenforceable. *See* 17A Am. Jur. 2d *Contracts* § 247, at 250 (1991).

We have previously recognized "the concept of contractual waiver of constitutional rights in civil cases." *Messina v. Iowa Dep't of Job Servs.*, 341 N.W.2d 52, 60 (Iowa 1983); *see also Callender,* 591 N.W.2d at 192. In so recognizing, we cited with approval a similar recognition by the United States Supreme Court, which "applied the usual [criminal context] standards requiring the waiver to be voluntary, knowingly and intelligently made" to determine whether a proper waiver had been accomplished. *Messina,* 341 N.W.2d at 60 (citing *D.H. Overmyer Co. v. Frick Co.,* 405 U.S. 174, 185–86, 92 S.Ct. 775, 782, 31 L.Ed.2d 124, 134 (1972)). We believe these standards permit a proper analysis of a potential contractual waiver of constitutional rights and apply them to this case

and our examination of the mediation document.

As *Santi, Howard,* and our discussion in this case make clear, John held a constitutional parental caretaking interest when he entered into the mediation with Arnie and Lucy. Yet, the document ultimately generated made no mention of this constitutional interest and provides no evidence of a thoughtful relinquishment of it. In fact, the document itself and the testimony at trial reveal that the parties' approach to the document was relatively informal, with little if any discussion of the legal ramifications—much less the more specific constitutional ramifications—of its signing. Indeed, it was generated in a mediation session that was not attended by counsel for either party. The mediator, when asked whether there was "any discussion about the facts that there may be underlying fundamental constitutional rights and issues" involved, explained,

A. You know what I think that—I don't remember if that was ever mentioned or not. It—I continue to try to stay away from any legal issues. I kept saying to both parties, remember I'm not an attorney, that's not my expertise. My expertise is kids and that's what I would be arbitrating.

Although it is unnecessary to define the precise threshold at which John would have become sufficiently informed to have validly waived his constitutional parental rights, it is clear the threshold was not reached in this case. The document signed at the mediation is unenforceable.

## V. Conclusion.

 Clearly, "[t]here is no doubt, in a broad sense, that grandparent-grandchild relationships are beneficial and should be promoted." *Howard,* 661 N.W.2d at 190; *see also Santi,* 633 N.W.2d at 320. Yet, as we have recognized before, "such a gener-

alization falls short of establishing the type of harm that would justify state intervention into a parental decision denying contact." *Howard*, 661 N.W.2d at 190; *see also Santi*, 633 N.W.2d at 320. Iowa Code section 598.35(3) all but fails to contemplate a harm justifying state intervention and is not narrowly tailored to advance a compelling state interest. For this reason, it is unconstitutional. Moreover, the constitutional dimensions of the parental caretaking interest require any waiver of that interest to be "voluntary, knowingly and intelligently made." *Messina*, 341 N.W.2d at 60 (citing *D.H. Overmyer Co.*, 405 U.S. at 185–86, 92 S.Ct. at 782, 31 L.Ed.2d at 134). A proper waiver was not accomplished in this case by the mediation document signed by the parties. We affirm the ruling of the district court.

**AFFIRMED.**