**IN THE COURT OF APPEALS OF IOWA**

No. 16-1537
Filed November 8, 2017

**IN THE MATTER OF THE GUARDIANSHIP OF S.K.M.,**

**JARED MCTAGGART,**
Interested Party-Father of Minor Child/Appellant,

**ERIC J. METZ and CHRISTINA M. METZ,**
Guardians of Minor Child/Appellees.
_____

Appeal from the Iowa District Court for Dubuque County, Monica L. Ackley, Judge.

A father appeals from a decision denying his petition to terminate a guardianship over his daughter. **REVERSED AND REMANDED.**

McKenzie R. Hill of O'Connor & Thomas, P.C., Dubuque, for appellant.

Jamie A. Splinter of Splinter Law Office, Dubuque, for appellees.

Heard by Vaitheswaran, P.J., and Potterfield and McDonald, JJ.

**MCDONALD, Judge.**

A father, Jared, appeals from an adverse decision on his petition to terminate the guardianship of his minor child, S.K.M.

I.

Stephanie and Jared are the parents of S.K.M. (born 2007). The parents separated a few months after the child was born. After the parties separated, Stephanie and S.K.M. lived with relatives in Cedar Rapids and Grinnell. Jared went to college in Dubuque and began working part-time for FedEx, an international package delivery company.

In early 2009, Stephanie informed Jared she was unable to care for S.K.M., and she asked Jared if he would take physical care of S.K.M. At the time, Jared was still in college and living with roommates. Jared asked for time to get his own apartment. Without waiting, Stephanie gave physical care of S.K.M. to her father, Eric Metz, and his then-girlfriend, now-wife, Christie, in Grinnell. Stephanie informed Jared she was going to file a petition to appoint Eric and Christie S.K.M.'s temporary guardians. Jared was served notice of the guardianship proceeding and had actual knowledge of the guardianship proceeding, but he chose not to participate in the proceeding. The juvenile court established a guardianship for S.K.M. and appointed Eric and Christie S.K.M.'s guardians. After the guardianship was established, Stephanie moved to Colorado. Although she has returned to Iowa, she has had little contact with the child.

In the summer of 2009, Jared left college and sought full-time employment. He was offered a full-time position with FedEx in Chicago, which

he accepted. He moved to Chicago in January 2010. During this time, Jared's mother Brenda exercised visitation with S.K.M. and A.L.M., Jared's other child by another mother, every other weekend. Jared would occasionally make the trip from Chicago to Cedar Rapids to stay with his mother and visit his children. Brenda brought the children to Chicago to see Jared on a few occasions as well. Jared had approximately thirteen or fourteen in-person visits with the children during his time living in Chicago. He had frequent, perhaps even daily, phone contact with S.K.M.

In early 2012, the Metzes moved to Dubuque. In June 2012, Jared accepted a lateral position with FedEx in Madison, Wisconsin. Jared exercised visitation with S.K.M. more frequently after moving to Madison, which is closer to Dubuque. There was evidence he exercised visits more than every other weekend during the summer of 2012, including some extended visits.

In August 2013, Jared accepted a promotion with FedEx in Neenah, Wisconsin. Shortly thereafter, the Metzes filed a petition to terminate the parental rights (TPR) of both biological parents. The juvenile court denied the TPR petition. The Metzes appealed, and this court affirmed the juvenile court's decision. *See In re S.M.*, No. 14-0287, 2015 WL 4644820, at *6 (Iowa Ct. App. Aug. 5, 2015). We noted:

> It is also in the best interests of S.M. that the father's rights not be terminated. The record established S.M. and the father shared a bond. While he has clearly relinquished the day-to-day care of S.M. to the guardians, and been satisfied with her placement, he has not removed himself from S.M.'s life so as to break that bond.
>
> We do note that the [guardian ad litem (GAL)'s] observation the father did not do nearly as much as he could to meaningfully parent S.M. has merit. A great deal of the father's visitation was

taken up with the father's mother caring for S.M. It is also apparent from the record the father visited S.M. when it was convenient for him and his employment, irrespective of S.M.'s need to have her father present. Additionally, the father—given his increased income over the years—could have contributed more to S.M.'s physical care and maintenance.[1] According to the guardian-grandfather, instead of voluntarily contributing to S.M.'s support, the father asked whether the guardians were "going to turn him into child support because he's making more money."

However, these shortcomings do not satisfy the requirements of abandonment within the meaning of Iowa Code section 600A.8(3)(b). As noted above, the record establishes the father satisfied his child support obligation and has maintained contact with S.M. Consequently, we agree with the juvenile court's conclusion the guardians failed to prove by clear and convincing evidence the father's parental rights to S.M. be terminated pursuant to Iowa Code section 600A.8(3)(b).

*Id.*

In April 2014, Jared filed a petition to terminate the guardianship. Jared testified he had not sought to terminate the guardianship earlier because he wanted to wait until such time as he believed he had achieved sufficient financial stability to be able to provide for all the needs of S.K.M. In November 2014, Jared moved to Crystal Lake, Illinois, after accepting a lateral position with FedEx. Jared continued to visit his daughters. During this time, he often stayed with a friend, Brandon Moorman, in Cedar Rapids. Jared rented rooms in Brandon's house to allow his daughters a place to stay when Jared was in town for visits. The evidence regarding the frequency of Jared's visits with his daughters after he moved to Crystal Lake was in some dispute. He testified he had visitation every other weekend, but the Metzes testified it was a year before

---

[1] At the time of the TPR trial, the father's child support obligation for S.K.M. was $60 per week. *See S.M.*, 2015 WL 4644820, at *5. During the TPR proceedings, the Metzes and A.L.M.'s biological mother separately filed to increase his obligations. Jared now pays $635 per month in support for S.K.M. and $560 per month in support for A.L.M.

he exercised visitation rather than allowing his mother to exercise the visits for him. The Metzes did agree his visits had been "pretty consistent" in 2016. There was also some evidence the Metzes prohibited visits for a period of time beginning in October 2015 because they alleged Jared was harassing them. This prohibition seems to have lasted for "the fall" and no more.

Trial on Jared's petition to terminate the guardianship took place over three days in June 2016 and a fourth day in July 2016. Between the June and July dates, Jared was offered a promotion with FedEx in a position in Mount Pleasant, Iowa. His girlfriend, Carrie, was also optimistic she would be getting a job offer for a lateral move with FedEx, where she also worked, near Mount Pleasant. They had put an offer on a house by the time of the July hearing date. In Mount Pleasant, Jared would be approximately an hour from his mother in Cedar Rapids and two hours from S.K.M. in Dubuque.

The district court denied Jared's petition to terminate the guardianship. The district court noted the statutory presumption in favor of placing children with their biological parents, but found the parental preference was "lessened" because Jared "ignored the summons to appear at court [at the time of the guardianship petition] and allowed the matter to proceed by default." The court found the Metzes met their burden to overcome the lessened parental preference or, alternatively, Jared had not shown a substantial change in circumstances to warrant a custody modification. Jared now appeals.

II.

The case law regarding the applicable standard of review in guardianship proceedings is somewhat muddy. We agree with the conclusion of *In re*

*Guardianship and Conservatorship of D.D.H.*, 538 N.W.2d 881, 882–83 (Iowa Ct. App. 1995), that the appropriate standard of review for cases involving the establishment of a guardianship is for errors at law, not de novo. The Iowa Code clearly states that actions for the involuntary appointment of guardians and conservators shall be triable in probate as law actions. *See* Iowa Code §§ 633.33, .555 (2013). Our review of actions tried at law is for the correction of errors at law. *See* Iowa R. App. P. 6.907.

III.

Prior to resolving the merits of the appeal, we first address a preliminary issue. The Metzes contend Jared does not have standing to bring this action because only the ward may bring an action to terminate the guardianship. *See* Iowa Code § 633.679(1) (providing "the person under guardianship or conservatorship may apply to the court by petition . . . asking that the guardianship or conservatorship be terminated"); *see also In re Guardianship & Conservatorship of Schmidt*, 401 N.W.2d 37, 38 (Iowa 1987) (dismissing an adult stepson's petition to terminate a guardianship over his mother).

This court recently rejected the same standing claim. *See Maruna v. Harper*, No. 15-1899, 2016 WL 5930881, at *1–3 (Iowa Ct. App. Oct. 12, 2016). We quote from our prior opinion at length:

> [T]he statutory framework does not support such a restrictive reading of section 633.679. Several provisions within chapter 633 envision the termination of guardianships over minors without a prior filing of a petition by the minor. For example, section 633.551(2) states that either the ward or the guardian may petition to terminate the guardianship. *See* Iowa Code § 633.551(2). Section 633.551(3) gives the district court, rather than the ward, authority to determine the scope of the guardianship in deciding whether a guardianship should be terminated. *See id.*

§ 633.551(3). Section 633.675(1)(a) says a guardianship shall cease "[i]f the ward is a minor, when the ward reaches full age." *Id.* § 633.675(1)(a). Section 633.675(1)(d) states a guardianship shall cease "[u]pon determination by the court that the conservatorship or guardianship is no longer necessary for any other reason." *Id.* § 633.675(1)(d). Section 633.675(2) states a guardianship created under the child-in-need-of-assistance statute shall not be terminated before the child turns eighteen "unless the court finds by clear and convincing evidence that the best interests of the child warrant a return of custody to the child's parent." *Id.* § 633.675(2). Section 633.679(2) omits reference to the ward as filer in connection with guardianships created under the child-in-need-of-assistance statute. *See id.* § 633.679(2). In sum, the statutory scheme on guardianships over minors contemplates termination of guardianships at the behest of people other than the ward, by the district court on its own motion, or automatically when the child turns eighteen. Accordingly, section 633.679 cannot be read as precluding parents from filing requests for termination of guardianships over their minor children.

Case law supports this interpretation. Both before and after *Schmidt*, our appellate courts considered petitions to terminate guardianships filed by parents of minor children. *See* [*Stewart*, 369 N.W.2d at 822–23] (considering father's application to terminate guardianship with grandparents); *Patten v. Patrick*, 276 N.W.2d 390, 393 (Iowa 1979) (considering father's petition to terminate a guardianship over his child pursuant to section 633.675(1)(d)); *In re Guardianship of Sams*, 256 N.W.2d 570, 571 (Iowa 1977) (considering mother's application for termination of guardianship); *In re H.M.S.*, No. 15-0898, 2016 WL 1130963, at *4–5 (Iowa Ct. App. Mar. 23, 2016) (considering father's petition to terminate guardianship with maternal aunt and uncle); *Stanley v. Aiken*, No. 09-0723, 2010 WL 2602172, at *4–6 (Iowa Ct. App. June 30, 2010) (considering request by mother to terminate guardianship); *In re Guardianship of Roach*, 778 N.W.2d 212, 214–16 (Iowa Ct. App. 2009) (considering mother's petition to terminate a guardianship of her child with paternal grandparents); *In re Guardianship of Briggs*, No. 06-2083, 2007 WL 1827517, at *3–5 (Iowa Ct. App. June 27, 2007) (considering father's petition to terminate the maternal grandmother's guardianship of his son); *In re Guardianship of Hall*, No. 02-0845, 2003 WL 1969282, at *2–5 (Iowa Ct. App. Apr. 30, 2003) (considering petition to terminate guardianship filed by parents of child).

This case law makes sense. Qualified and suitable parents are afforded a statutory preference for appointment as guardian. *See* Iowa Code § 633.559. The preference would be meaningless if it did not come with the ability to seek termination of an existing

guardianship. We conclude Maruna, as the father of the minor ward, had standing to seek termination of the guardianship.

*Id.* at *2–3. We see no reason to deviate from our prior opinion. Jared has standing to seek the termination of the guardianship of his biological daughter.

IV.

This case involves the termination of an existing non-parental guardianship. The inquiry is highly fact-intensive. There are numerous cases continuing a non-parental guardianship at the behest of a guardian against the wishes of a parent, and there are numerous cases terminating a non-parental guardianship at the behest of a parent and against the wishes of a guardian. The parties have cited these authorities in their respective briefs and discussed, at length and with great skill, their application to the case at hand. However, each case, viewed in isolation, is merely a pointillist dab on a large canvas. To draw meaning, we must retreat a distance and focus not on the dabs but instead on the emergent image. We retreat to first principles.

> The interest of parents in the care, custody, and control of their children is a fundamental liberty interest with which the State cannot interfere without establishing a compelling governmental interest for doing so. The right was initially recognized in the seminal case of *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923), in which the Court upheld the right of parents to "establish a home and bring up children." The right repeatedly has been reaffirmed by the Supreme Court. In *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944), the Court concluded that "custody, care, and nurture of the child reside first in the parents." In *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972), the court reiterated the primacy of parental rights, stating the "primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." The issue was again revisited in *Troxel v. Granville*, 530 U.S. 57 (2000), where the court addressed the constitutionality of Washington's grandparent visitation statute. The Court discussed the long history of cases protecting parents' rights, concluding "it cannot now be doubted that the Due Process Clause

of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel*, 530 U.S. at 66. The *Troxel* Court held Washington's statute was overbroad because it allowed grandparents to visit a child over parental objection without any showing the parent was unfit. *See id.* at 68–69 (stating so long as a parent is "fit," there will normally be no reason for state interference).

After *Troxel*, the Iowa Supreme Court addressed the issue of grandparent visitation rights. In *Santi v. Santi*, 633 N.W.2d 312, 321 (Iowa 2001), the court held part of Iowa's grandparent visitation statute facially unconstitutional under article I, sections 8 and 9 of the Iowa Constitution. The court reasoned that parents' rights to the care, custody, and control of their children is a fundamental interest subject to interference only for a compelling interest. *Santi*, 633 N.W.2d at 318. The court explained the grandparent visitation statute was fundamentally flawed "because it does not require a threshold finding of parental unfitness before proceeding to the best interest analysis." *Id.* at 321. The court revisited a different provision of the law in *In re Marriage of Howard*, 661 N.W.2d 183 (Iowa 2003). There, the court affirmed its conclusion that interference with the fundamental right of parents to the care, custody, and control of their children requires the State to establishing a compelling interest. *Howard*, 661 N.W.2d at 188. It noted the "essential presumption of fitness accorded a parent." *Id.* at 190. In holding the law unconstitutional, the court explained "the best interests of a child requirement . . . is insufficient" to establish a compelling state interest. *Id.* at 191. The court concluded the statute was unconstitutional on its face because it "not only fails to recognize the degree of harm or potential harm to the child needed to support state intervention, but it 'fails to require a threshold finding of parental unfitness.'" *Id.* at 192 (quoting *Santi*, 633 N.W.2d at 321).

*In re Guardianship of C.R.*, No. 14-1039, 2015 WL 576385, at *4–5 (Iowa Ct. App. Feb. 11, 2015) (McDonald, J., concurring in part and dissenting in part).

Iowa's guardianship statute and caselaw recognize and protect a parent's fundamental interest in the care and custody of a child. Iowa Code section 633.559 creates a parental preference with respect to the appointment of a guardian, providing that a natural parent, "*if qualified and suitable*, shall be preferred over all others for appointment as guardian." Iowa Code § 633.559

(emphasis added). And "[b]ecause of the fundamental constitutional rights implicated, a nonparent bears the burden of persuasion throughout guardianship proceedings, including initial appointment, modification, or termination to rebut the presumption favoring parental custody by providing clear and convincing evidence of parental unsuitability." *In re Guardianship of Blair*, No. 01-1565, 2003 WL 182981, at *5 (Iowa Ct. App. Jan. 29, 2003) (citing *In re Guardianship of Hedin*, 528 N.W.2d 567, 581 (Iowa 1995)).

When viewed from the distance of first principles, our cases demonstrate there are several ways in which a nonparent-guardian can overcome the parental preference in resisting the termination of a guardianship. First, a parent is not entitled to the presumption if there was a prior custody determination involving a full evidentiary hearing and the presumption was overcome. *See Stewart*, 369 N.W.2d at 824 (stating if "the relative custodial rights of the proposed guardian and the parent were put in issue and tried in [a] guardianship proceeding" then there is no longer a parental preference). This is merely judicial recognition that the constitutionally-mandated preference of parent custody has already been overcome in a prior proceeding and need not be proved again. Once the preference is eliminated, the burden of proof shifts to the natural parent to prove a substantial change in circumstances warranting a change in custody. *See Roach*, 778 N.W.2d at 215. In addition, the parent must establish a change in custody is in the best interest of the child. *See id.* (explaining the purpose of the guardianship proceeding is to provide for the best interest of the child). A guardianship by consent or default, as was the case here, does not qualify as

prior custodial determination following a full evidentiary hearing. *See H.M.S.*, 2016 WL 1130963, at *4; *Stanley*, 2010 WL 2602172, at *4 n.2.

Second, we have held "a parent who has taken an extended holiday from the responsibilities of parenthood' may not take advantage of the parental preference for custody." *Roach*, 778 N.W.2d at 215 (citation omitted). Our cases have not clearly delineated what constitutes an extended holiday. When viewed from sufficient distance, the contour becomes more clear. Although not articulated as such, this line of cases merely recognizes a parent may expressly or impliedly waive the parental preference by waiving the underlying constitutional right to the care, custody, and control of a child. *See, e.g., Callender v. Skiles*, 591 N.W.2d 182, 192 (Iowa 1999) ("Despite the presence of an existing family, the rights of a putative father cannot be denied without an opportunity for a hearing. That right, however, like other constitutional rights, can be waived."). At minimum, as with the waiver of any constitutional right, the resisting party must show "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). For example, a nonparent could show the parent has explicitly renounced parental responsibility. By way of another example, a nonparent could show the parent has abandoned the child for a sufficiently long period of time to establish an abandonment of the right to care and custody of the child.

Jared has not expressly or impliedly waived his constitutional or statutory right to the care, custody, and control of his child. Jared has paid support for the child during the entirety of the child's life. He has exercised continuous and regular visitation with the child in-person or telephonically since the time of the

child's birth.  The evidence introduced at trial showed Jared and the child have a bond.  We also note that while the child has been in the custody of Eric and Christie for a lengthy period of time, the parties have been litigating the custody question since the spring of 2013.  We cannot hold against Jared this extended passage of time due to litigation delay.  Finally, our court has already affirmed a prior decision denying the grandparents' petition to terminate Jared's parental rights on the ground he abandoned the child.  *S.M.*, 2015 WL 4644820, at *6.  While proof of waiver of a parent's rights, within this context, would not necessarily be jot-for-jot with the proof necessary to terminate a parent's rights pursuant to statute, the inquiries are similar.  In short, Jared has not expressly or impliedly waived his right to the parental preference.

Our cases also present a third image.  A nonparent-guardian can establish a parent is not "qualified and suitable" within the meaning of the statute.  Under this line of cases, Eric and Christie were required to prove by clear and convincing evidence that Jared is not "qualified and suitable" to serve as the guardian of S.K.M. and that continuation of the nonparent-guardianship is in the best interest of S.K.M.  *See Santi,* 633 N.W.2d at 321; *see also* Iowa Code § 633.559.

> The code does not define "qualified and suitable."  Our cases have not clearly defined "qualified and suitable."  In light of *Troxel*, *Santi*, and *Howard*, in a guardianship proceeding involving nonparents seeking to [continue] care, custody, and control over a child contrary to the legal parent or parents' wishes, "qualified and suitable" should be interpreted to require proof the parent(s) is "unfit."  At minimum, this requires evidence the parent cannot provide the child with reasonable parental care, meaning nurturing and protection adequate to meet the child's physical, emotional, and mental health needs and that the parent's inability to provide

reasonable parental care poses a substantial and material risk of harm to the child.

*C.R.*, 2015 WL 576385, at *5. Proof of unfitness is constitutionally necessary to justify continued interference in the relationship between a natural parent and his child. *See Quilloin v. Walcott,* 434 U.S. 246, 255 (1978) (stating it would violate due process to interfere with the natural family unit without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest)*; Howard*, 661 N.W.2d at 188. *But see In re Guardianship of M.E.*, No. 16-1178, 2017 WL 2465791, at *7 (Iowa Ct. App. June 7, 2017) (recognizing "second basis" for termination of guardianship when, "notwithstanding the parent being qualified and suitable, the nonparent has rebutted the parental preference and the welfare and best interest of the child requires custody to remain in the nonparent").

When we apply the relevant legal standard to the facts of this case, the grandparents have not established by clear and convincing evidence that Jared is not qualified and suitable. Indeed, the evidence is to the contrary. Jared has been continuously employed with the same employer since the child's birth and has been promoted to increasing levels of responsibility within the employer-organization. He now has the financial means to provide for the physical needs of the child. Over the course of time, he has demonstrated the ability to meet the social and emotional needs of the child. He has had regular and continuous in-person and telephonic contact with S.K.M. since her birth and has a bond with the child. He has relocated to a community closer to where S.K.M. resides to

allow her to maintain continued relationships with her extended family, including Eric and Christie.

Lacking from this record is any fact that would give pause to Jared exercising care and custody over the child. There is no indication he suffers from mental illness. *Cf. Hall*, 2003 WL 1969282, at *5 (restoring care to biological parent who dealt with mental illness). He has never struggled with substance abuse. *Cf. In re Guardianship of Padgett*, No. 09-1672, 2010 WL 3894452, at *1–3 (Iowa Ct. App. Oct. 6, 2010) (restoring care to biological parent who overcame substance-abuse issues); *Briggs*, 2007 WL 1827517, at *5 (same). Domestic violence has not been an issue in his home. *Cf. Stanley*, 2010 WL 2602172, at *5 (restoring care to biological parent who addressed domestic violence in home). He does not have a serious criminal history. *Cf. Patten*, 276 N.W.2d at 398 (affirming denial of father's petition to terminate guardianship where father testified "he would not commit another felony unless 'it was something really big.'"). There has never been any concern of child abuse or neglect. *Cf. Blair*, 2003 WL 182981, at *5 (affirming denial of parent's petition to terminate guardianship where parent had repeatedly neglected child and no evidence of improvement existed). In short, none of the typical factors in establishing parental unfitness are present in this case.

To the extent we can draw any guidance from an individual dab, this case most strongly resembles *Stewart*. There, the father and the guardians, the maternal grandparents, established a guardianship while the father progressed in his career and obtained a level of financial stability to provide for the child. *See Stewart*, 369 N.W.2d at 823. Approximately four years after the guardianship

was established, during which time the father regularly visited the child, the father petitioned to terminate the guardianship. *Id.* at 822. Hearing on the father's petition was held more than three years after he filed his petition due to his service abroad in the air force. *See id.* The district court afforded the father the parental presumption and terminated the guardianship. *See id.* The supreme court affirmed: "William certainly never abandoned his daughter. He kept in close touch with the [guardians], provided regular financial support, and frequently visited [the child]. He requested termination of the guardianship when he believed he was ready to take care of her just three years after the guardianship had been set up." *Id.* at 823. Here, too, Jared kept in touch with the guardians, provided regular financial support, and visited the child. He requested termination of the guardianship once he believed he was financially able to provide for S.K.M. and had obtained a position in the area where she had been raised.

This case is also similar to a recent decision of this court. In *In re Guardianship of J.M.M.*, No. 13-0945, 2014 WL 667669, at *3 (Iowa Ct. App. Feb. 19, 2014), this court affirmed the termination of a nonparent-guardianship in favor of the parent. The evidence showed the mother had been absent from the children's lives for almost ten years. During that time period, she worked to overcome her substance-abuse addictions and criminal behavior. She also worked to obtain financial stability to be able to provide for her children. We concluded the guardians failed to prove that at the time of trial the mother was not "qualified and suitable to parent her children." This case presents a stronger case in favor of the parent. Here, Jared has provided financial support for the

child since her birth. He has been active in her life and built a bond with her. And he sought to terminate the guardianship when the child was much younger.

As in *Stewart* and *J.M.M.*, the guardians in this case have not established the guardianship over S.K.M. should continue over Jared's objection. Jared did not lose the benefit of the parental presumption because of a prior guardianship proceeding. *See Stewart*, 369 N.W.2d at 824; *H.M.S.*, 2016 WL 1130963, at *4; *Stanley*, 2010 WL 2602172, at *4 n.2. The grandparents did not establish Jared expressly or impliedly waived the constitutional right to the care, custody, and control of S.K.M. or the statutory right to the parental presumption. Finally, the grandparents failed to prove by clear and convincing evidence that Jared is not "qualified and suitable" within the meaning of our guardianship statute. There has thus been no showing sufficient to overcome the parental presumption. In concluding otherwise, the district court applied the incorrect legal standards and otherwise erred as a matter of law. We therefore reverse the judgment of the district court.

We close by noting nothing in this opinion should be interpreted to be a criticism of Eric and Christie, who have lovingly and admirably served as S.K.M.'s guardians for these years. Their desire to continue to serve as guardians of S.K.M. contrary to Jared's wishes was motivated by their love for their granddaughter and their good-faith belief it would be in her best interest to maintain the present arrangement. However, "[o]ur cases have emphasized that parents should be encouraged in time of need to look for help in caring for their children without risking loss of custody. The presumption preferring parental custody is not overcome by a mere showing that such assistance was obtained.

Nor is it overcome by showing that those who provided the assistance love the children and would provide them with a good home." *Sams*, 256 N.W.2d at 573. We are confident Jared recognizes and appreciates the sacrifice Eric and Christie have made in serving as caretakers for S.K.M.. We are also confident he recognizes and appreciates that allowing S.K.M. to have continuous and regular contact with her grandparents is in his best interest and S.K.M.'s best interest.

V.

For the above reasons, we reverse the judgment of the district court and remand this matter for the entry of an order terminating the guardianship over S.K.M.

**REVERSED AND REMANDED.**