# IN THE COURT OF APPEALS OF IOWA

No. 16-1584
Filed September 27, 2017

**CAMERON COOK,**
      Petitioner-Appellant/Cross-Appellee,

**vs.**

**TUYET NORIEGA,**
      Respondent-Appellee/Cross-Appellant.

_____

Appeal from the Iowa District Court for Butler County, DeDra Schroeder, Judge.

Cameron Cook appeals and Tuyet Noriega cross-appeals the child custody, visitation, and support provisions of the decree establishing paternity, custody, visitation, and support. **AFFIRMED ON APPEAL; AFFIRMED AS MODIFIED ON CROSS-APPEAL.**

Nina Forcier of Forcier Law Office, P.L.L.C., Waterloo, for appellant.

Dorothy L. Dakin and Daniel J. Johnston of Kruse & Dakin, L.L.P., Boone, for appellee.

Heard by Potterfield, P.J., Mahan, S.J.,* and Scott, S.J.*

*Senior judges assigned by order pursuant to Iowa Code section 602.9206 (2017).

**MAHAN, Senior Judge.**

A father appeals and a mother cross-appeals from the child custody, visitation, and support provisions of the decree establishing paternity, custody, visitation, and support of the parties' two children.

We affirm the placement of the children in the parties' joint legal custody and in the mother's physical care. We modify the decree to provide the mother with the right of first refusal to provide for the children's care when the father's National Guard duties require his absence during his parenting time.

**I. Background Facts and Proceedings.**

Cameron Cook and Tuyet Noriega began a relationship in 2010. Their child, A.C., was born in 2011. Although their personal relationship deteriorated, Cook and Noriega continued to live together, parent A.C. together, and share expenses.

In 2015, Cook was a police officer for the city of Waterloo, earning about $53,000; he was also a part-time officer for Aplington making an hourly wage;[1] a volunteer firefighter, for which he is paid $100 per year; and a member of the National Guard, for which he earned an additional $11,400 per year for his service. Noriega was employed at Ellsworth Community College earning about $44,000 per year.[2]

On June 29, 2015, Cook filed a petition to establish paternity, custody, placement, and visitation of A.C. He sought shared physical care of the child.

---

[1] In 2015, he earned approximately $14,000 from his shift work in Aplington. However, he anticipated a much reduced number of shifts in 2016 because Aplington had hired an additional full-time officer.

[2] Of the $44,000, $10,000 was for teaching as an adjunct professor. Subsequent budget cuts terminated those duties.

On July 6, 2015, Noriega informed Cook she was pregnant with their second child.[3] Cook did not take the news well and an argument ensued. Noriega and A.C. left the house and went to the home of Noriega's co-worker. Both Noriega and Cook filed complaints with local law enforcement about the incident.

On September 9, 2015, the district court entered an order on temporary matters pertaining to A.C.—the child was to remain in Noriega's physical care; Cook was to pay $671 per month in support beginning September 15; and Cook would have visitation every Tuesday and Thursday evening from 5:00 p.m. to 8:00 p.m., and every other weekend from Friday at 5:00 p.m. to Sunday at 5:00 p.m.

Noriega gave birth to a child, C.N., prematurely in January 2016. Cook did not want his name on the birth certificate without proof of his paternity.[4] Noriega filed an application for temporary support for the child, which Cook resisted.

---

[3] Noriega's first pregnancy was complicated by preeclampsia, resulting in a premature delivery of A.C. The second pregnancy was high risk.

[4] Noriega testified:

> We discussed about it. There was a day right before—I didn't name the baby until five days—it was like four or five days after the baby was born. We were sitting in the hospital. We were talking about names. And there w[ere] two names that we were going back and forth on. And he made it seem when [A.C.] said, "[C.], I want [C.]," he was like, "Okay." So he knew what the name was going to be.
>
> For the [child's] last name, I don't know if that was the part you're talking about. I had asked him on multiple occasions if he was going to sign [the birth certificate]. Nurses, the doctor, also asked for the last name. And he had said "No, I'm not the father. No, I'm not the father." So he wasn't going to sign the birth certificate. So at that point when he was saying "No, I'm not the father," he's not going to get the last name.

The court concluded both children would have the same last name—the older child "knows her name" and "[w]e're not going to change her name . . . the kids are going to have the same last name."

Noriega suffered medical complications just after being discharged from the hospital and was transported by life-flight to Iowa City, where she remained for two weeks with C.N. Cook cared for A.C. for the two weeks Noriega was in Iowa City. Upon Noriega's release from the hospital, and though she had not seen A.C. for two weeks, Cook refused to allow her to see A.C. until his scheduled visitation time was up.

On February 12, 2016, a DNA test report indicated Cook was C.N.'s father. On February 18, Cook amended his paternity petition to request joint physical care of C.N. as well.

The paternity action was tried on March 23 and July 18, 2016. At the time of trial, Cook lived in Aplington and worked for the City of Waterloo forty hours per week at $25.35 per hour. He also worked part-time for the City of Aplington for $13.00 per hour plus $2.00 per hour for on-call pay, and continued to serve in the National Guard.

Noriega lived and worked in Iowa Falls, approximately twenty-five miles and about a one-half hour drive from Aplington. Noriega worked with students at Ellsworth College, making $33,518 annually. She provided health insurance for the children, paying $77.08 per month. She stated she had day care expenses of $150 per week.

Cook testified he and Noriega were both active in A.C.'s care. He complained that Noriega did not encourage his relationship with C.N. and that Noriega did not allow him to take and care for the infant while Noriega was hospitalized. At the time of trial, Cook testified he wanted A.C. to attend school in Ackley because it was half way between Aplington and Iowa Falls. He

requested joint physical care of the children, or in the alternative, that physical care of both children be placed with him.

When asked about not letting Cook take C.N. while she was hospitalized, Noriega observed Cook was denying he was C.N.'s father and noted the infant went with her to the hospital in Iowa City to promote her breast-feeding efforts. She also stated Cook was invited to visit the infant in her home, but she did not allow Cook to take the child away from her presence because it interfered with the child's hourly breastfeeding. Noriega testified that historically she provided the majority of care for A.C. She stated that after their separation and pursuant to an April 2016 temporary order, Cook had parenting time with A.C. every Tuesday and Thursday from 5:00 to 8:00 p.m. and alternating weekends from Friday to Sunday. Noriega explained that once Cook's paternity was established, visits between Cook and the baby had transitioned to Cook having the infant in his care for longer periods as C.N. got older, and he had recently kept C.N. overnight on a Friday he had A.C. in his care, and also during the days on his Saturdays and Sundays. Noriega testified Cook had helped financially with A.C. until July 2015, and then did not pay anything until ordered to by the September temporary order, and Cook had refused to pay any support for C.N.

Noriega testified she did not think joint physical care would work because she and Cook had difficulty communicating without conflict; most of their communications were by text message; Cook and she did not agree on where A.C. would go to school and where the children should get medical care; there were disagreements about extracurricular activities and who would pay for them; there had been instances of Cook using force against her; and his family did not

support her. Noriega expressed that she wanted A.C. to attend school in Iowa Falls, where Noriega lives and works and with which A.C. is familiar, has friends, and has already gone to school.

Cook's mother, Barbara Cook, testified Cook was an involved parent to A.C. Barbara stated she never had concerns about the care A.C. received from Noriega.

Tracie Self testified she is a friend and coworker of Noriega's and a licensed mental health counselor. Self testified Noriega is a "very conscientious mother" with "a great deal of concern about how the kids are doing," "put[ting] their needs far above her own." She described the events of July 6, 2015, after Noriega had informed Cook about her pregnancy. Self testified Noriega came to her door that evening accompanied by A.C. Noriega was distressed and not properly dressed. Noriega reported to Self that Cook had grabbed her and pushed her into a wall. Self saw a red mark on Noriega's arm and encouraged Noriega to make a report with the police. Self also testified Cook treated Noriega in a controlling and condescending manner with which Self was uncomfortable.

Tim Joebgen, a deputy sheriff, testified that he took a complaint from Noriega on July 6, 2015. Noriega asserted Cook had grabbed her by the arm and pushed her against the wall. Deputy Joebgen did note a red mark on Noriega's arm.

Deputy Sheriff Kiley Winterberg testified about responding to a call from Cook on July 6, 2015. Cook "advised that they [he and Noriega] had an argument, and she had left, and that he had just wanted to make a written statement so he had one on file for future reference in case anything ever

became of it." Cook walked the deputy "through the rooms step by step, saying what happened, that she had shoved him at one point, and the toy that they had been arguing over." Winterberg stated no charges were filed because:

> We had a statement from him stating that he got shoved. We had a statement from her stating that she got shoved and that she had a light bruise on her arm. And I never talked to her. Deputy Joebgen talked to Miss Noriega. And we had told them both that if they both were adamant that they wanted charges filed, we would file charges on each other, but we wouldn't file charges on just one or the other. From the information and stuff that we had had, we couldn't prove that just one person had been assaulted and not the other.

At the close of the evidence, the court ruled A.C. should be enrolled in Iowa Falls schools for the upcoming school year.

On August 19, 2016, the district court entered a written decree establishing Cook's paternity of A.C. and C.N. and placing the children in the parties' joint legal custody and in Noriega's physical care. A parenting schedule was set, and Cook was ordered to pay child support in the amount of $1063.11 per month beginning August 15, 2016. The court also ruled:

> [Cook] shall be entitled to claim [A.C.] as a dependency exemption each tax year and [Noriega] shall be entitled to claim [C.N.] as a dependency exemption each year. [Cook]'s ability to claim the dependency exemption is conditioned on the fact that he is current in his child support obligation at the end of each calendar year. However, to help equalize the fact that [Noriega] did not receive support for the oldest child for the months of July through September, 2015, and did not receive support for the youngest child since birth, [Noriega] should be entitled to claim both children as dependency exemptions for tax years 2016 and 2017.

Cook filed a motion for enlarged findings, asking that the court change C.N.'s last name and for a ruling that during the times he is not available for parenting time due to his National Guard duties, his parenting time be assigned

to his mother. Noriega resisted, asking that both children have her last name, and that she should be given the right of first refusal to care for the children during Cook's National Guard obligations. Noriega filed a motion to enlarge as well, asserting the court had granted Cook two nonconsecutive weeks of uninterrupted summer parenting time but had made no similar provision for Noriega.

On September 7, 2016, the court entered an order changing C.N.'s last name, granting Noriega two nonconsecutive uninterrupted weeks with the children during the summer, and providing: "When [Cook] is not available for his parenting time due to being at the National Guard, his parenting time may be assigned to his mother at Cook's discretion." Both parents appeal.

## II. Scope and Standard of Review.

"Generally, in paternity actions, we review issues 'ancillary to the question of paternity, such as support,' de novo." *Markey v. Carney*, 706 N.W.2d 13, 19 (Iowa 2005) (citation omitted). We give weight to the trial court's findings because it had the ability to view and assess the witnesses' demeanor and credibility. *See In re Marriage of Vrban*, 359 N.W.2d 4320, 423 (Iowa 1984) ("There is good reason for us to pay very close attention to the trial court's assessment of the credibility of witnesses. A trial court . . . 'is greatly helped in making a wise decision about the parties by listening to them and watching them in person.' In contrast, appellate courts must rely on the printed record in evaluating the evidence. We are denied the impression created by the demeanor of each and every witness as the testimony is presented." (citation omitted)).

**III. Discussion.**

*A. Cook's appeal.* Cook argues the court should have placed the children in the parties' joint physical care, or alternatively, in his physical care. He also contends the court's ruling as to the tax credit was an improper "punitive measure," and that the court erred in having Noriega provide the children's health coverage because it was less costly for him to do so.

Cook requested joint physical care of the parties' children. *See* Iowa Code § 598.41(5)(a) (2015) ("[T]he court may award joint physical care to both joint custodial parents upon the request of either parent."); *Montgomery v. Wells*, 708 N.W.2d 704, 707 (Iowa Ct. App. 2005) (noting that chapter 600B confers subject matter jurisdiction upon the district court to decide cases of paternity, custody, visitation and support between unmarried parties and section 600B.40 grants the district court authority to determine matters of custody and visitation as it would under section 598.41). "If the court denies the request for joint physical care, the determination shall be accompanied by specific findings of fact and conclusions of law that the awarding of joint physical care is not in the best interest of the child." *Id.* § 598.41(5)(a).

> In deciding child custody matters, the district court is to enter a decree
>
> which will assure the child the opportunity for the maximum continuing physical and emotional contact with both parents after the parents have separated . . . , and which will encourage parents to share the rights and responsibilities of raising the child unless direct physical harm or significant emotional harm to the child, other children, or a parent is likely to result from such contact with one parent.

*Id.* § 598.41(1)(a). The "'[b]est interest of the child' includes but is not limited to the opportunity for maximum continuous physical and emotional contact possible with both parents." *Id.* § 598.1(1).

The court is to consider the factors listed in section 598.41(3), including:

> a. Whether each parent would be a suitable custodian for the child.
> b. Whether the psychological and emotional needs and development of the child will suffer due to lack of active contact with and attention from both parents.
> c. Whether the parents can communicate with each other regarding the child's needs.
> d. Whether both parents have actively cared for the child before and since the separation.
> e. Whether each parent can support the other parent's relationship with the child.
> . . . .
> g. Whether one or both the parents agree or are opposed to joint custody.
> h. The geographic proximity of the parents.
> i. Whether the safety of the child, other children, or the other parent will be jeopardized by the awarding of joint custody or by unsupervised or unrestricted visitation.
> j. Whether a history of domestic abuse, as defined in section 236.2, exists.

Our supreme court has emphasized these factors: (1) stability, continuity, and approximation of past parenting patterns, (2) the ability to communicate and show respect, (3) the degree of conflict, and (4) the degree of agreement as to child-rearing practices. *In re Marriage of Hansen*, 733 N.W.2d 683, 697-99 (Iowa 2007). "No single one of the . . . factors listed in section 598.41(3) is a condition precedent to allowing joint custody, nor is there a certain number of factors which, when satisfied, will either mandate or prohibit a joint custody award." *In re Marriage of Weidner,* 338 N.W.2d 351, 358 (Iowa 1983).

Here, the district court denied joint physical care, finding Noriega had been the primary care provider; the parent to schedule doctors' appointments, arrange preschool, and arrange day care; the parent more flexible with changing visitations and affording Cook extra time with the children; and the parent more likely to promote a continuing relationship between the children and the other parent. The court found Cook "somewhat rigid in his dealings" with Noriega, inflexible, and "somewhat controlling." The court noted Cook was initially hesitant to admit paternity and that he had "minimally provided financial help for [C.N.] by way of diapers and wipes." In addition, the court noted Cook's work obligations had required that he be out of the home for significant periods of time and that Cook had "stubbornly refused to acknowledge that leaving firearms accessible to young children could have dire consequences," choosing "to lock up the guns following a temporary custody hearing" and not when Noriega had asked. The court also noted that "[h]arsh realties follow when parents separate and reside in different towns and school systems." The court found the parties "cannot communicate effectively," noting they "cannot even divide up children's toys without a physical altercation taking place." While Cook argues the trial court's findings are flawed, we conclude the findings are supported by the record and provide ample reason for denying joint physical care and placing the children in Noriega's physical care. We do not disturb the custody or visitation provisions of the decree.

We also reject Cook's assertion that the trial court improperly granted the tax exemption to Noriega. Cook points to his one payment of $400 to the daycare provider and his payment to Noriega beginning in April 2016 of $100 per

week toward the support of C.N., arguing this is more than "minimal support" as found by the trial court. Iowa Code section 600B.25(1) provides:

> Upon a finding of paternity pursuant to section 600B.24, the court shall establish the father's monthly support payment and the amount of the support debt accrued or accruing pursuant to section 598.21B. . . . The court may order the father to pay amounts the court deems appropriate for the past support and maintenance of the child and for the reasonable and necessesary expenses incurred by or for the mother in connection with prenatal care, the birth of the child, and postnatal care of the child and the mother, and other medical support . . . .

Cook does not deny that he provided no support for A.C. from July 2015 until September 2015, no prenatal assistance for C.N., and no support for C.N.'s care from her birth in January until April 2016. Under these circumstances, we find no fault with the trial court's allocation of the tax credit as a means of equalizing Cook's payments.

Finally, Cook complains in passing that the court erred in determining Noriega should cover the children's medical insurance. He offers no authority or argument, and we find the issue waived. *See* Iowa R. App. P. 6.903(2)(g)(3) ("Failure to cite authority in support of an issue may be deemed waiver of the issue.").

***B. Noriega's cross-appeal.*** Noriega asserts the court had no authority to allow Cook to assign his parenting time to a third party. We agree.

In *In re Marriage of Klemmensen*, No. 14-1292, 2015 WL 2089699, at *3 (Iowa Ct. App. May 6, 2015), the father was a firefighter and a National Guard member, which often required extended time away from the child. The father testified he planned to have extended family or a babysitter care for the child when he was required to work an overnight shift. *Klemmensen*, 2015 WL

2089699, at *3. There, we noted that "[o]ur law requires a custody award that will 'assure the child maximum continuing physical and emotional contact with both parents.'" *Id.* (citation omitted). We concluded that the mother should be given "the right of first refusal" when the father was required to work for twelve or more consecutive hours or during his National Guard weekends if the mother does not already have visitation scheduled for that weekend. *Id.* at *4.

Noriega notes that Iowa law provides military personnel may assign their parenting time when they deploy, *see* Iowa Code § 598C.305, but that provision is not applicable here because deployment is defined as a mobilization of "more than ninety days." *Id.* § 598C.102(8). Because no provision authorizes the court to allow a parent to assign parenting time otherwise, Noriega asserts the court erred in allowing Cook to do so here.

Cook asserts the "right of first refusal" is applicable only to a non-custodial parent. While the cases in which we have addressed the issue have been where the parent seeking "right of first refusal" is the non-custodial parent, *see Klemmensen*, 2015 WL 2089699, at *1; *In re Marriage of Lauritsen*, No. 13-1889, 2014 WL 3511899, at *1 (Iowa Ct. App. July 16, 2014), we do not agree that fact makes a difference. The "right of first refusal" arises from the principle that a parent has a fundamental interest in caring for a child. *See In re Marriage of Howard*, 661 N.W.2d 183, 190-92 (Iowa 2003) (finding the grandparent-visitation statutory provision unconstitutional because it allowed unwarranted intrusions into the decisions of fit parents); *see also Lamberts v. Lillig*, 670 N.W.2d 129, 134 (Iowa 2003) ("[T]he constitutional dimensions of the parental caretaking interest require any waiver of that interest to be 'voluntary, knowingly, and intelligently

made.'" (citation omitted)).  Of course, we would urge Noriega to work with Cook to allow substitution of weekends so Cook is not deprived of time with his children as a result of his service in the National Guard.  But we conclude the district court erred in allowing Cook to assign his parenting time.  We modify the decree accordingly.

**AFFIRMED ON APPEAL; AFFIRMED AS MODIFIED ON CROSS-APPEAL.**